ALICE WILLIAMS, APPELLANT, V. AGNES VOLZ ET AL., APPELLEES.

FILED JULY 1, 1936. No. 29610.

*Walter G. Badham*, for appellant.

*Wayne E. Sawtell, contra.*

Heard before GOOD, EBERLY and PAINE, JJ., and CLEMENTS and THOMSEN, District Judges.

PAINE, J.

This is an equity action between two sisters over the proceeds of a $1,000 mutual insurance policy upon the life of their mother. At the close of plaintiff's testimony the trial judge, upon motion of defendant, dismissed petition of plaintiff, who appeals.

As the opinion in this case will turn on a question of evidence, we will set out the facts. The mother, Anna

Kenney, took out a policy of $1,000 on her life April 12, 1904, and carried it until her death on November 1, 1934. The policy was issued by the Women's Catholic Order of Foresters, of Chicago. The monthly assessment was $3.38, and later was raised to $3.73.

At the time of her death the said Anna Kenney had no real or personal property, and left no estate of any kind.

The rules of the insurance order required that, when the insured desired to make a change in the beneficiaries she should fill out a form, which appeared in the policy, and send that to the company, whereupon the old policy was canceled and a new policy was issued to the new beneficiaries.

The beneficiaries have been changed by this insured perhaps a half dozen times, and in November, 1932, the mother was living with her daughter, Agnes Volz, one of the defendants, and this daughter had been paying two-thirds of the monthly premiums and was dissatisfied with the amount going to her in the policy then in force because of her payment of such a large portion of the premiums, such policy then in force being dated April 21, 1926, and providing for $300 to go to each of the three sisters, to wit, Agnes Kenney Volz, Catherine Kenney Hislop, and Alice Kenney Williams, and the balance to Reverend Flanagan, director of the Father Flanagan's Boys' Home at Omaha, for masses. Alice Williams was glad to pay only one-third of the premiums, yet was dissatisfied with the amount of $300 going to her under the policy then in force, because she had loaned her mother, during the years 1931 and 1932, sums of money which amounted at the time the mother died to about $260. The mother and these two daughters talked these matters all over, and it was orally agreed between them that the mother would change the beneficiaries and give Alice and Agnes each $475, and leave $50 for masses, and thereafter the two sisters, Agnes and Alice, would divide the premiums equally between them. On November 28, 1932, the mother signed the change of beneficiary form, and the policy was surrendered and a

new one issued to carry this agreement into effect. From that date until the date of the mother's death, these two sisters each paid their half of the premiums by each paying the assessment every other month and taking a receipt therefor.

On November 28, 1932, the mother was living with Agnes, but in October, 1933, she moved and made her home with Alice, and on October 30, 1933, had a very severe stroke, which paralyzed one side, one-half her tongue and mouth were paralyzed, food would run out of her mouth, and she could not use her hands, even to hold her rosary beads.

There is testimony of a close friend of Mrs. Kenney for many years, who testified that she had called on her for years, and that after she had the stroke of paralysis she was unable to understand a word that Mrs. Kenney said, and that her mind was just the mind of a child.

On April 26, 1934, the mother was taken back to live with her daughter Agnes, where she remained until her death. On Monday after the mother's death Alice discovered for the first time that the insurance policy had been sent back to the company for another change of beneficiaries; that a new policy for $1,000 had been issued on June 25, 1934, which gave Alice only $100 in the place of $475, as agreed, and gave to her sister Agnes, with whom the mother was living at the time of the change, $750, and gave to her brother, Lawrence, $100, and still left $50 for masses. This shows that just two months after the mother was taken back to live with Agnes this change in the amounts payable to the two sisters had been brought about. The plaintiff brought this action in equity, asking that the insurance company pay the money due on the policy into court, which the insurance company promptly did, and that the disposition of it be made by the court.

In the petition it is charged that Agnes and her brother, Lawrence, prevailed upon the mother, who was then in a helpless condition mentally and physically, to wrongfully surrender the policy and have the new one issued, raising

the amount going to Agnes from $475 to $750, but the evidence was lacking on this point.

In the trial in the lower court, six notes signed by the mother for money loaned her by Alice were introduced in evidence, also a receipt for $5 paid for the ambulance to take the mother to St. Catherine's Hospital, also a copy of the policy, showing the change of beneficiaries by the mother on June 25, 1934. During the taking of the evidence of the plaintiff and her husband and a neighbor, Catherine Gilbert, the defendants constantly made objections to the reception of evidence, basing the objections upon section 20-1202, Comp. St. 1929. The court overruled the many objections, saying, "Well, I will receive the evidence and hear you later," and the defendants, for the purpose of preserving this objection, refused to cross-examine the plaintiff or her husband when they were on the stand, on the ground that defendants did not wish to be bound by their evidence, and therefore did not go into any transactions with the deceased at all. As soon as the plaintiff rested, the defendants made a long objection, based upon section 20-1202, Comp. St. 1929, and upon that ground asked that the plaintiff's petition be dismissed, which motion was sustained by the trial court.

Counsel contend that this brings before this court, as the question of law involved which will determine our decision in the case, whether this section of the statute applies to the facts in this case.

Section 20-1201, Comp. St. 1929, says that every human being of sufficient capacity to understand the obligation of an oath is a competent witness in all cases. If an attempt is made to keep him from testifying on the ground that he is incompetent, then a definite law must be found which will exclude his testimony. Such a law is section 20-1202, Comp. St. 1929, which reads: "No person having a direct legal interest in the result of any civil action or proceeding, when the adverse party is the representative of a deceased person, shall be permitted to testify to any transaction or conversation had between the deceased person and the

witness"—then follow the exceptions. This section appeared in our statutes as early as 1866, and was rewritten in 1883, and has been cited hundreds of times in the Nebraska Reports, there being nearly four pages of annotations following this provision, which was section 1314, in Cobbey's Annotated Statutes, 1911, and in the 25 years since then it is rather difficult to find a Nebraska Report without reference to this section.

In 1 Wigmore, Evidence (2d ed.) on pages 865 to 911, are listed the various forms of this law from nearly all of the states, as well as the Philippines and Hawaii. There are less than a half dozen states which do not have this disqualification statute in some form. The purpose of the law is good, and it was intended to prevent an undue advantage on the part of the living over the dead, who can no longer defend himself against the misrepresentations and falsehoods of the survivor, and the rule has been of inestimable value in barring fraudulent claims against estates.

On the other hand, attempts to carry the rule too far may also result in harm for which there is no relief. An examination of Nebraska cases shows a few cases in which the broad statement of the rule has been limited by our court. Commissioner Irvine, in *Wylie v. Charlton*, 43 Neb. 840, 62 N. W. 220, says that the interest of Mrs. Wylie as an heir, not being an interest adverse to the representatives of the deceased, would not of itself be sufficient to exclude her testimony when offered against the representatives. He indicates that the common-law rule, rendering incompetent all persons interested in the result of an action, is not adapted to conditions of today, and that this statute should be construed as if it read that no person having a direct legal interest in the result of an action shall be permitted to testify when the party interested adversely to the witness' interest is the representative of a deceased person.

Commissioner Pound, in *Williams v. Miles*, 68 Neb. 463, 94 N. W. 705, follows the case of *McCoy v. Conrad*, 64 Neb. 150, 89 N. W. 665, and says that persons who would take as heirs or next of kin in case of intestacy are not disquali-

fied under this section from testifying as to transactions and conversations with the deceased in a contest over an alleged will. In *Brown v. Forbes,* 1 Neb. (Unof.) 888, Commissioner Albert said the person's testimony should be excluded when the adverse party is an executor, administrator, or legal representative of a deceased person.

A rather complete and critical discussion of this rule is found in 12 Neb. Law Bulletin, 282, which closes with a statement of the hardships worked under the rule and the difficulty of its application.

The case at bar does not stand alone, for we find many opinions in which beneficiaries have sought to profit under similar conditions. In *Gledhill v. McCoombs,* 110 Me. 341, 86 Atl. 247, 45 L. R. A. n. s. 26, an action was brought by the mother of Edwin Gledhill against his wife to recover the proceeds of a life insurance policy of $10,000 payable to his estate. He gave the policy to his mother before his marriage, and told her it was hers and for her to take care of it. It is held that, while the life insurance policy was payable to his estate, it may still be made the subject of a gift. The policy did not belong to the estate, and the administrator had no right to the policy, but was simply the agency to collect and conduct the proceeds to the true owner, the mother. The plaintiff mother was held not to be a creditor of her son nor of his estate.

In *Supreme Council, Royal Arcanum v. Tracy,* 169 Ill. 123, 48 N. E. 401, Thomas P. Tracy became a member of the Royal Arcanum of Chicago, and received a benefit certificate of $3,000. His wife had advanced him cash, and he turned the certificate over to her and surrendered it to her because of her advance to him of $1,500. He later made a claim to the association that he had lost the certificate, and had a new certificate issued to him. This new certificate was based upon a false affidavit on his part. It was a fraud upon the wife and the organization, and his daughters, to whom the new certificate was made payable, are mere volunteers, as the wife had a vested interest in the certificate.

In the case of *Stronge v. Supreme Lodge, Knights of Pythias,* 189 N. Y. 346, 82 N. E. 433, Irvine was seriously ill, and made an agreement with his sister-in-law that if she would give up her home in New York and take a cottage in New Jersey, and take him there and nurse him, he would make her the beneficiary of his insurance policy. She did just as she promised, and he had his insurance certificate transferred to her. Irvine recovered somewhat and went to Texas, and while there he tried to cancel the certificate that was in his sister-in-law's possession. She would not surrender it to him. The lodge would not issue a new one until the old one was canceled, but finally agreed that, if he would put up an indemnifying bond to indemnify the lodge against the old certificate, they would issue him a new one. This is all shown by the correspondence, but before he had put up the bond he died.

We admit that the by-laws and rules of the organization give the right to the insured to change to a new beneficiary at any time, but this applies to a case where a beneficiary has been voluntarily and gratuitously designated, and who has acquired no interest whatever in the certificate. We find cited in the opinion the case of *Conselyea v. Supreme Council, American Legion of Honor,* 3 App. Div. 464, affirmed 157 N. Y. 719, in which case a certificate was given by the husband to his wife as part of his settlement with her in a separation agreement, and he agreed not to change the beneficiary, and the wife agreed on her part to pay all the premiums due on the policy, which she did. Then the husband tried to cancel his insurance by withdrawing from membership in the order. It was held that he could not do that.

*Garner v. Townes,* 134 Miss. 791, 100 So. 20, is a case somewhat in point. J. K. Townes brought suit against the appellant, Elizabeth Garner, a minor, and the Equitable Life Assurance Society to cancel an assignment of a $5,000 life insurance policy on his life, which assignment to Elizabeth was made by his father. The insurance company replied, claiming no interest in the matter whatever. On

December 16, 1909, the son borrowed $3,500 of his father, and assigned the policy to his father. The assignment was in writing, absolute in form, acknowledged by the son, but was given only as security for the debt. In January, 1913, the son paid off the loan from his father in full, and the insurance policy was surrendered to the son by the father, who promised to immediately reassign the policy back to the son, and a day or so later he went to the office of a justice of the peace, taking the policy along for the purpose of executing a reassignment of the policy, but the office of the justice was closed. Soon thereafter the father went to Battle Creek, Michigan, and soon died. It then appeared that on March 26, 1913, about three months before the son paid his father, and while the policy was assigned to his father, the father had assigned the policy to Elizabeth Garner, his granddaughter, as a gift. The legal questions involved are: First, whether the son was a competent witness of these facts in his own behalf; second, whether the evidence of the son was admissible to prove that his assignment of his policy, which was absolute in form, was only intended as collateral security for a loan from his father. The Code renders a person incompetent to testify as a witness to establish his own claim against the estate of his deceased father. But the estate of the father was not a party to the suit. Before his death the father had transferred all his right in the policy by the delivery of the policy to the son when the debt was paid, or he had divested himself of all interest in the policy by assigning it to his granddaughter. He had done one or the other, or both of them, and in any event neither the father nor his estate had any interest in the policy. One of these assignments must stand, but both of them cannot stand. If the son succeeds in his suit he will not thereby establish any claim against the estate of his father, as the estate is not interested, directly or indirectly, nor is it involved in any way in this cause of action. In other words, if the son succeeds in this lawsuit, the estate of his father will not be diminished. We are of the opinion, under this state of facts,

that the son so situated is a competent witness under the statute to testify in this case.

To summarize the case at bar, we find that about November 28, 1932, the sisters made an agreement to share the premiums equally and receive an equal amount of the insurance when the mother died. The mother became paralyzed, childish, and entirely helpless, and Agnes took the mother into her home on April 26, 1934. On May 2, 1934, Alice had an attorney write the insurance order, notifying them of the agreement between the sisters as to sharing the premiums and proceeds, and asking the insurance order to make no change in beneficiaries. In spite of this, Agnes sent in the policy and on June 25, 1934, had a new one issued, giving her $750 and her sister Alice only $100, and concealed this new plan from her sister, and permitted her to continue to pay one-half the assessments until the mother died, November 1, 1934.

In this case the deceased had no estate, and had absolutely no interest in the insurance, for she could not get any of the proceeds of this policy, which was payable only after her death.

Such a valid agreement could have been made to the same effect, even if all of the insurance had been payable to one of these sisters. The fact that the mother was present, or that she assisted in their agreement by changing the amounts going to these beneficiaries, does not change the legal effect of the contract as to the two sisters.

Plaintiff insists that the rule of evidence (Comp. St. 1929, sec. 20-1202), is the only question involved. If that were true, as equity will not suffer a wrong to be without a remedy, and regards that as done which ought to be done, then equity will prevent a rule of evidence designed to prevent fraud from being used as an instrument for injustice. 21 C. J. 203.

But, in our view of it, the rule of evidence is not the only question involved. We believe that the proceeds of this policy, having been paid into court by the insurance order, constitute a constructive trust to be applied by the court

in carrying out whatever agreement the court shall find, after a new trial, was made between these sisters.

In *Sorensen v. Sorensen*, 56 Neb. 729, 77 N. W. 68, it is stated, in referring to this rule of evidence, that, if there is reasonable doubt in the mind of the court, then the witness and the evidence are competent. This well expresses the situation. There being grave doubts as to its application to this case, we find the evidence should have 'been admitted, and it was prejudicial error to dismiss plaintiff's petition. The judgment of the trial court is

REVERSED.